## The Wabash Railroad Company v. John S. Jellison.

### Gen. No. 12,228.

1. PASSENGER—*where burden of proof rests where plaintiff was a.*
Where the plaintiff in an action on the case for personal injuries
was a passenger, the burden of proof is upon the defendant to show
that the accident happened without its fault.

2. PASSENGER—*who is.*   Held, from the facts of this case, that a
mail clerk in the employ of the United States government was a
passenger of the defendant carrier, as well while in transit as dur-
ing the ensuing period when he, pursuant to a long-continued cus-
tom, remained in the yards of the defendant at work in his car.

3. PASSENGER—*what not essential to status of.*   It is not es-
sential to establish the status of a passenger to show that fare was
either paid or intended to be paid.

Action on the case for personal injuries. Appeal from the Superior Court of Cook County; the Hon. ARTHUR H. FROST, Judge, presiding. Heard in this court at the March term, 1905. Affirmed. Opinion filed March 1, 1906.

**Statement by the Court.** This is an appeal from a judgment in the Superior Court of Cook county obtained by Jellison, the appellee here and plaintiff below, against the Wabash Railroad Company, the appellant here and defendant below. The judgment was for $1,375. It was rendered on the verdict of a jury in an action for negligence causing personal injuries. The declaration in the cause was originally filed January 23, 1902, and consisted of two counts. The first count was abandoned before trial. The second count described the defendant as a corporation operating on March 20, 1901, a line of railway extending through the city of Decatur, Illinois, and the plaintiff as a postal clerk in the employment of the United States Government in the railway mail service. It alleged that at Decatur on March 20, 1901, the plaintiff was in one of the cars of the defendant working as a railway mail clerk; that it was the duty of the defendant so to handle its cars and switch tracks as not to injure the plaintiff while he was in said car pursuing his duties as such railway mail clerk, but that while the plaintiff, using due care for his own safety, was in the car at his duties, the defendant by its servants so carelessly operated and handled one of its switch tracks and one of its locomotives that the said mail car was suddenly and without warning struck with great force, which threw the plaintiff upon the floor and against the side of said car and against obstacles therein, and greatly hurt him.

December 24, 1902, by leave of court an additional count was filed to the declaration. It alleged that on March 20, 1901, the defendant operated certain trains of cars in conveying passengers and United States mail; that plaintiff was a postal clerk and in charge of one of the mail cars, and then alleged the duty of the defendant and the happening of the accident as did the original declaration.

To these two counts the defendant filed the general issue.

The case was tried for the first time on January 8, 1903, and
the jury returned a verdict for the plaintiff of $1,700. The
court later in the same month sustained a motion for a new
trial.

March 9, 1903, by leave of court the plaintiff filed three
additional counts to his declaration. The second additional
count described the accident and the duty and negligence of
the defendant as before, and alleged that the plaintiff was a
postal clerk in the employ of the United States Government,
and in said employment had charge and control of certain
mail cars, in one of which cars he was by his employment
and by and through the permission, consent, invitation and
knowledge of said defendant required to be while it was
upon the side-tracks of the defendant for the purpose of re-
ceiving and handling mail matter.

The third additional count charged that the defendant was
possessed of a yard in the city of Decatur, which it used and
operated in its business of hauling mails for the government
and government employees in charge thereof, in which yard
it controlled certain side tracks and switches; that. while
defendant was in the business of carrying the mail it caused
the car in charge of the plaintiff to be upon the tracks of
said yard during a portion of the night, and in its business
of transporting mails caused the mails during the night to
be put into the car where plaintiff was, and required and
permitted the plaintiff in his duty as railway mail clerk to
occupy said car during the night for the purpose of receiv-
ing said mails and assorting and placing the same prepara-
tory to being then transported over its railroad by the de-
fendant, and that the defendant adopted the plan of having
said mail delivered in said cars upon the sidings in said
yards and there assorted and prepared for transportation by
the plaintiff and other mail clerks before said car was placed
in any of its trains, and at an early hour in the morning
permitted, required and invited the plaintiff to be in said
car in said yards, so to prepare and assort said mail before
the same was placed in its regular trains. It then alleged

the duty of the defendant and its negligence and the consequent accident and injury as in the preceding counts.

The fourth additional count alleged the defendant to be possessed of certain railroad yards in Decatur, used by it in its railroad business and in transporting mail matter for the United States Government, and that it operated certain mail cars and engines in said yards in said business; that the plaintiff was in the employ of the United States Government as a mail clerk, and that his duties required him to be in one of defendant's certain mail cars at the time of the accident, and that the servants of the defendant in charge of the yards and control of an engine, wantonly, wilfully and with gross negligence recklessly ran into said car, and thereby the plaintiff was injured as before described.

The plea of the general issue was ordered to stand as to these additional counts, and the cause was again submitted to the jury in September, 1904. A verdict for the plaintiff for $1,375 resulted. A motion for a new trial and a motion in arrest of judgment were denied, judgment rendered on the verdict and this appeal taken.

The evidence showed the following state of facts:

The plaintiff, Jellison, was a man fifty-four years old at the time of the accident. He had been in the mail service thirteen years. For at least two years before March 20, 1901, he had been a railway postal clerk between Decatur, Illinois, and Quincy, Illinois, on the road of the defendant, on mail car No. 230. This car ran between Quincy and Decatur on the following schedule: It left Quincy at 5:30 each evening and arrived in Decatur at 11:10 the same evening. Returning, it left Decatur at 4:45 in the morning and reached Quincy at 10:50 in the forenoon. Four clerks were employed on this run in connection with this car, two at a time. Two were on duty for seven days, and then the other two relieved them, thus making a week on and a week off for each pair. One of the two clerks took care of the papers, the other of the letters. Usually mail clerks Edward S. Henrichsen and Clarence C. Boyd made this run together for one week, and the plaintiff, Jellison, and some other

clerk worked together the following week. On March 20, 1901, however, Henrichsen and Jellison were on the same run.

During all the time that these various clerks worked on the mail car (in the case of Clarence C. Boyd it had been six years) it had been the custom of the mail clerks, or one of them, to get out of the car and go to a baggage room to register arrival, and then return to the car for the night. The two clerks slept in the car. Two cots were there for their use. At one end of the car was storage room for the storage of mail before distribution. In the rest of the car were the letter cases, the table arranged for the distribution of the mail and the racks with the mail sacks for throwing the mail at the stations. After the arrival of the mail car 230 at 11:10 p. m. there came into the Wabash yards at Decatur train No. 2 from St. Louis at 11:23 p. m., train No. 5 from Toledo at 11:30 p. m., train No. 13 from Chicago at 3:17 a. m., train No. 3 from Detroit at 3:20 a. m., and a train from Indianapolis at 4:30 a. m., all bringing mail sacks which were transferred to car No. 230. The heaviest mail came on the Chicago train at 3:17, in several sacks. From train No. 3 from Detroit and other Michigan points two sacks or pouches were received.

All this mail was on its reception taken by a depot baggageman of the Wabash Railroad and carried to and placed within the mail car No. 230, through the door at the end of the car. The plaintiff had an arrangement with the depot baggageman to place the mail from trains 2 and 5, passing through Decatur at 11:23 and 11:30, in mail car 230 as soon as he could after those trains had left. There would then be nothing more to receive until the Chicago mail, which arrived at 3:17. That mail and the subsequent ones from Detroit and Indianapolis were brought to the mail car 230 as soon as the depot baggageman could get the trucks up to the car after the trains bringing them had moved out. That made the delivery at the mail car of the Chicago mail, which was the heaviest of those received, at about 3:30 each morning. At some time between a quarter and half past three

each morning employees of the Wabash Railroad Company, car cleaners apparently, lighted the car. There were windows along the car sufficient to light the car for work during the day. The artificial light at night shone through these windows and marked the car as lighted and prepared for transportation. At 3:30 each morning the mail clerks who had slept in the car rose and went to work on the mail, distributing it for the stations between Decatur and Quincy. On the run between Decatur and Quincy they took up mail sacks at the various stations, continued to sort and distribute the mail therein and to throw off the sacks at the proper stations when they were reached. On the night of March 19, 1901, and the morning of March 20, 1901, this routine, which had been followed for at least six years, was not varied from, up to the time of the accident, which happened at 4:15 a. m.

Henrichsen and the plaintiff, Jellison, arrived at Decatur in car 230 at 11:10 on the evening of the 19th. One or both of them left the car, went across the platform to the baggage room and registered their arrival, as required. Then they or the one so registering returned to the car, and they both slept there that night. The mails were put into the car at the usual time, and at 3:30, the car having been lighted and prepared by the employees of the defendant, Henrichsen and the plaintiff went to work assorting and distributing the mail according to their custom. At 4:15 the accident out of which this action grew occurred.

The car 230 upon arriving in Decatur at 11:10 was generally, perhaps always, allowed to remain upon the track where it pulled in until the mail pouches coming in on No. 2 and No. 5. at 11:23 and 11:30 had been placed thereon. Then it was switched about and placed on any track convenient in the yards, there being no particular or regular place for siding it, but it was always put where it was easily accessible for the station force to put into it the mails that arrived at 3:17 and later.

There were four tracks in the yards running parallel east and west. The north one was called "a yard track" or "a

42

pocket," from its having been originally a stop, although at the time of the accident it was open and had switch connections at both ends. The next track towards the south was called the straight house track. It was on this track that the train from Quincy always pulled in, and on this track that the mail car remained until the mails arriving between 11 and 12 were placed in it. It was often switched during the night and had to be moved off of the house track before 3 a. m. to accommodate other trains passing through Decatur and making a stop there. This car and other cars, however, often stood during the night until about 3 a. m. on this track. The two southern tracks were main line tracks passing through the yards. There were usually five cars in the train from Quincy to Decatur,— sleeper, chair car, baggage car, smoking car and mail car. The sleeper, chair car and baggage car were sent out on various trains during the night. The mail car and smoking car were put in the train starting back for Quincy at 4:45 a. m., and that train was made up generally on the house track. The mail car was usually switched into the train on that track so made up before 4:30 a. m., so that the Indianapolis mail arriving at that time was generally placed in the mail car as it stood in the train ready to pull out.

On the night in question car 230 was taken at some time during the night from the track on which it ran into Decatur, and placed upon the most northerly track—the pocket track. On that track farther to the east were three other cars, next east of the mail car a baggage car known as 322, next to that another baggage car known as the Chicago baggage car, and farthest east a smoking car. Between 4 and 4:15 o'clock in the morning the switching engine of the defendant in charge of a switch foreman or yard conductor and a crew consisting of the engineer and fireman and two other men, ran out from the station west on one of the main tracks, and after passing the switch for the pocket track, backed down on it and coupled the engine on to the mail car and the three other cars standing east of it. These four cars were provided with automatic Gould couplers, and when

the engine met the mail car, and the coupling was made between them, the whole train of engine and four cars was backed east about two car lengths. The yard conductor then signaled the engineer to go ahead, and the whole train moved west at a speed of five or six miles an hour. The yard conductor had been standing where the coupling had been made between the engine tank and the mail car, and as the train passed he stepped on the platform of the rear car, the smoker. · The two switchmen were on the front platform of the same car. The switch onto the main track from which the engine had backed down to the pocket had been left open for this return trip. At some point after starting, and before reaching this switch, the couplings between the ·two baggage cars—No. 322 and the Chicago baggage car—parted without the. knowledge of anybody. The engine, mail car and No. 322 passed over the switch on to the main track fastened together. Fifteen or twenty feet behind them, the two rear cars, the Chicago baggage car and the smoker, also passed over the switch, moving by the original impetus given them before the couplings parted. When the engineer had gone as far west as he thought necessary to take the train over the switch, he stopped. The two rear cars continuing to move, bumped heavily into the car No. 322, and the impetus transmitted drove the mail car against the engine tank with force enough to break the bolts of the draw bar of the car and give it a very severe jolt. The plaintiff was at work at his distributing table, sorting letters, and his comrade, Henrichsen, was at his table working on papers. Henrichsen escaped unhurt, being, as he says, braced against the table because the train was being made up. The plaintiff was thrown against the table and received injuries for which he brought this suit.

The yard conductor had not noticed the breaking of the train. He stepped off the rear car as it passed the switch, and threw the switch so that the train could back down the main track. A moment later he heard the crash, and walking forward discovered the cause and the damage to the car. The night was blustering and snowy and there was steam

and smoke from a passing engine increasing the obscurity of the night.

After the accident the car was taken from the track on which it occurred and at some other point was repaired by men from the repair shop. After the repairs it went out at 7:20 that morning and plaintiff went with it, reaching Quincy between five and six o'clock in the evening. He was laid up for six weeks, and has since suffered in consequence of his injuries. Concerning some of the matters here stated there is some variance in the testimony, but we think the evidence taken together establishes them.

In this court it is alleged that the trial court erred in not peremptorily instructing the jury for the defendant—in admitting improper evidence for the plaintiff—in giving erroneous instructions, and in refusing proper instructions, and in not granting the motion for a new trial on the ground that the verdict was manifestly against the evidence.

Shope, Mathis, Zane & Weber, for appellant; C. N. Travous, of counsel.

Wood & Elmer and Samuel Cohen, for appellee.

Mr. Justice Brown delivered the opinion of the court.

This action being based on the alleged negligence of the defendant, which caused the injury to the plaintiff, a question which directly concerns the burden of proof arises at once as to the status of the plaintiff with relation to the carrier. Was he a passenger? If so, it is conceded that the burden of proof was thrown on the defendant to show that the accident happened without the fault of the defendant. N. J. R. R. Co. v. Pollard, 22 Wallace, 341. Under the evidence set forth in the prefixed statement, there can be no doubt, if plaintiff was a passenger, that there was ground for the recovery, that the cause was tried by the court below, and instructions given, on a theory of the law as favorable to the defendant as was justified, and that the judgment should be affirmed. If the cause turned upon this question

exclusively, we should hold that the plaintiff was a passenger in the defendant's care at the time of the accident.

Under a custom of years known, as we think the evidence shows, to all the agents of the defendant company who had charge of the arrangement of the defendant's railroad yards and of the course of the transhipment of the mails at Decatur from one train to another at the defendant's station, the plaintiff and his co-employees in the U. S. mail service between Decatur and Quincy had arrived in Decatur in mail car 230 at 11:15 each evening, had occupied the car all night in the yards of the company, had received mail in it brought by baggagemen of the defendant between eleven and twelve o'clock, had been in charge of that mail during the night in the car, had received more mail between three and four in the morning, and had been at work in the lighted car from 3:30 on to the time of their departure in it at 4:45 on the return trip. In view of the participation of the defendant's agents in this routine connected with car No. 230 for years, we should find it difficult to believe that the yard conductor had not good reason to know or believe that at 4 o'clock a. m. on the night in question, and on every other, there were persons in the car who were there in the discharge of their duties preparatory to a run on the road between Decatur and Quincy, who were there by arrangement and agreement, express or implied, between the railroad company and them, or between the railroad company and their employers, (which would be the same thing), and who were entitled by virtue of such arrangement or agreement (to say nothing of the statutes of the United States, which he was presumed to know) to transportation as passengers when the train began its journey. The yard master testifies, it is true, that he did not know whether anybody slept in the car. He certainly could not have supposed that bags of letter mail were put into an empty car, and the doors left open, without lights, and the car then carried around the yard wherever it happened to be convenient to put it, as "dead equipment," in charge of nobody. It did not need knowledge on his part of the undisputed fact that

for at least six years this never had occurred, to render it improbable to him that it was occurring or would occur.

Under these circumstances we think the plaintiff was a passenger in the car at all times throughout the night—certainly at the time of the accident in the morning.

A passenger need not have paid fare or be intending to pay fare. A passenger, according to standard definitions, is one who undertakes, with the consent of the carrier, to travel in the conveyance provided by the latter otherwise than in the service of the carrier as such. Shearman & Redfield on Negligence, sec. 488.

Leaving out of consideration for the moment the fact that the car was not in the made up train and upon its journey, but was being switched into its place at the time of the accident, it would seem that the plaintiff comes under this definition. This is impliedly at least conceded by counsel for appellant, who term a mail agent, when the train is actually on its journey, "a *quasi*-passenger." We do not think that there is any distinction between a "*quasi*-passenger" and "a passenger." The language of the English and American Encyclopedia of Law (2nd ed., Vol. V., page 511) is, "a postal clerk employed in the service of the government and engaged in its service, traveling on a train, whom by contract with government the company is bound to carry, must be considered a passenger for hire—at least in so far as the company's liability for his personal injuries through negligence is concerned."

This is fully borne out by the authorities which are there collected. Gleason v. Virginia Midland R. Co., 140 U. S. 435; Arrowsmith v. Nashville & Decatur Railroad Company, 57 Fed. Rep., 165; Baltimore & Ohio Ry. v. Voigt, 176 U. S., 498–518; C. C. C. & St. L. R. R. Co. v. Ketcham, 133 Ind., 346; Mellor v. Missouri Pacific R. Co., 105 Mo., 455; Seybolt v. Railroad Co., 95 N. Y., 462; Gulf Ry. Co. v. Wilson, 79 Texas, 371; and other cases.

The case of Blank v. Illinois Central R. R. Co., 182 Ill., 332, is not at variance with this rule. It is merely concerned

with an express messenger whose employer has contracted him out of the ordinary rights of a passenger—a situation which is expressly distinguished from that of a postal clerk by B. & O. R. Co. v. Voigt, *supra.*

The apparent exception to the rule indicated by the case of the Pennsylvania Co. v. Price, 96 Pa. St., depends upon a peculiar limitation to the Campbell Act of Pennsylvania, and merely deals with the meaning of the word "passenger" in that limitation. The dismissal of the writ of error in that case by the U. S. Supreme Court, 113 U. S., 218, turns wholly on the position that the U. S. statutes made no Federal question in the case. It is not in point here.

The statutes of the United States, however (Revised Statutes of The United States, sec. 400), are significant in this case so far as this: By providing that every railway company carrying the mail, shall carry on any train which may run over its road, and without extra charge therefor, all mailable matter directed to be carried thereon, with the persons in charge of the same, they remove entirely the necessity, if it would otherwise exist, of showing by contract between the Government and the defendant an agreement to carry persons in charge of the mails said defendant was receiving and transhipping at Decatur and carrying to Quincy.

But the appellant insists that whatever might have been the status of the plaintiff when actually *en route,* he was not a passenger at the time of the accident because he was not then *en route* and the train was not made up, nor the car at the station platform.

It is not necessary, however, in order to create the relation of carrier and passenger, that the passenger should have actually entered the vehicle for carriage—much less that the vehicle should have started on the journey with him. This is rudimentary. It is needless to cite authorities. Where, for example, the carrier provides a waiting room for the use of passengers, entry into those premises with intent to travel under the carrier's charge is sufficient to give the rights of a passenger for a reasonable time before the journey begins. The car, therefore, did not have to be *en*

*route* to constitute the plaintiff a passenger. But counsel say it was not at the place where it was appropriate and proper for passengers to take it, and therefore the plaintiff had no right to be in it, and no relation of carrier and passenger was established. In support of this position they urge with much insistence the opinion of the Circuit Court of Appeals of the United States for the Sixth Circuit, in the case of Farley v. Cincinnati, Hamilton & Dayton R. R. Co., 108 Fed. Rep., 14. Notwithstanding some of the circumstances of the accident itself in that case were very similar to those in the case at bar, the essential matters governing the decision were very different, and the implications of the opinion seem to us much stronger for the appellee's contention than for the appellant's. In that case the postal clerk injured had not arrived at Cincinnati in the car; he was simply to take it on its out trip. There was no custom proven for any clerk to board the car or any mail to be delivered to it until it arrived at the express platform before going out. On the contrary the exact antithesis of this custom was proven, and in fourteen years only three departures from it were known. Therefore, there being no evidence of any knowledge on the part of defendant of any custom for the clerk to be in the car at the place where the accident happened, nor of any actual knowledge that he was there, nor evidence indeed of any custom for him to be there, and that place being an unusual and inappropriate one for him to take the car, and he having taken it before it was ready and before mail was delivered to it, the court held that the relation of carrier and passenger had not been created— a very obvious conclusion. The court said: "The difficulty to a railroad company in exercising a high degree of care towards persons on cars in motion in its switch yards, and the increased liability from obligation to do so, are so manifest that a usage or custom relied on to create the relation of carrier and passenger and impose on the railroad company this high duty, ought, under such conditions upon the plainest principles of justice, to be established by evidence which shows or strongly tends to show a well defined,

definite and continuous practice from which knowledge on the part of the Company may be fairly inferred."

We agree with this entirely; but in the present case the verdict of the jury under the instructions given to them may well have implied that they thought the test here laid down was met. We think that it was. We fail to see in the present case why the plaintiff should not, during the entire night, have been considered a passenger in the care of the carrier as fully as a person might be in a sleeping car switched or shunted during the night to side tracks, as such cars frequently are, at termini or connecting centres, to wait for transfer to some outgoing morning train, or for the more convenient disembarkation of the passengers by daylight. Certainly it could not under such circumstances be claimed that the passengers were mere licensees in their occupation of the car.

As before indicated, if the plaintiff be considered a passenger, nothing more is necessary to dispose of the contention before us. If, however, it should be conceded that he was not a passenger, or that, as appellant contends, he is estopped from claiming that he was a passenger by reason of having voluntarily discontinued as to the first count of his declaration, we should still be obliged to hold that the circumstances proven were sufficient to show the plaintiff to be a person impliedly invited by defendant to be where he was when the accident occurred, and that at the very least the defendant was bound to exercise towards him reasonable care. The contention of appellant that he was a mere licensee, to whom nothing more than abstention from wanton and wilful injury was due, seems to us without force. If the burden was on the plaintiff to prove negligence and want of reasonable care on the part of the defendant, proper instructions favorable to the defendant were given to the jury on that assumption, and we do not think the verdict of the jury could be held inconsistent with the evidence.

If sound automatic Gould couplings never or seldom part in such a switch as this, then the principle of *res ipsa loquitur* might be applied, and it might be said that either

the couplings were at fault, which would render the defendant liable, or that the yard master was negligent in not seeing that the coupling had been properly made before he signaled the engineer to move out from the pocket.

But if, as appellant insists, these couplings frequently and unaccountably do part in switches like this, then the yard master, knowing that a lighted car in which clerks were at work was in the cut of cars which he was switching, should not have drawn the cars out without leaving a man at the switch lever. Such a lookout man could have prevented the accident by warning the engineer against too immediate a stop beyond the switch. Indeed, in such a case the jury might have been justified in believing that the engineer in any event brought his locomotive to a stop too soon. We think that there was no evidence of contributory negligence on the part of the plaintiff, that the jury were justified on the facts in their finding, that the instructions given were, under the view of the law which we hold, as favorable as defendant was entitled to, that there was no reversible error in the admission of evidence, that the counts of the declaration were at least sufficient after verdict, and that substantial justice has been done. We shall not disturb the judgment, which is affirmed.

*Affirmed.*